Justin Sharp v. State of Maryland, No. 58, September Term, 2015

**PRESERVATION FOR APPELLATE REVIEW – ALLEGED IMPERMISSIBLE CONSIDERATIONS DURING SENTENCING – DECISION NOT TO PLEAD GUILTY –** Court of Appeals held that: (I) defendant preserved for appellate review issue of whether trial court considered during sentencing defendant's decision not to plead guilty; and (II) record did not support inference that trial court might have been motivated during sentencing by impermissible consideration of defendant's decision not to plead guilty.

Circuit Court for Baltimore County
Case No. 03-K-13-002447

Argued: February 9, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 58

September Term, 2015

_____

JUSTIN SHARP

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Hotten,

JJ.

_____

Opinion by Watts, J.
Battaglia, J., joins in judgment only.

_____

Filed: March 25, 2016

This case concerns the worrisome issue of whether, in imposing a sentence, a trial court impermissibly considered the defendant's election not to plead guilty, and, more specifically, whether the trial court impermissibly considered that the defendant declined the "court's offer" of a plea agreement.

We decide: (I) whether, here, the defendant preserved for appellate review the issue of whether the trial court impermissibly considered during sentencing the defendant's decision not to plead guilty; and, if so, (II) whether, here, the record supports the inference that the trial court might have been motivated during sentencing by the impermissible consideration of the defendant's decision not to plead guilty.

We hold that, here: (I) the defendant preserved for appellate review the issue of whether the trial court impermissibly considered during sentencing the defendant's decision not to plead guilty; and (II) the record does not support the inference that the trial court might have been motivated during sentencing by the impermissible consideration of the defendant's decision not to plead guilty.

## BACKGROUND

In the Circuit Court for Baltimore County ("the circuit court"), the State, Respondent, charged Justin Sharp ("Sharp"), Petitioner, with attempted first-degree premeditated murder, first-degree assault, and openly wearing and carrying a dangerous weapon with the intent to injure. These charges arose out of a St. Patrick's Day party during which Sharp allegedly severely beat a young man.

### Plea Offers

On April 30, 2014, the scheduled trial date, the parties appeared before the circuit

court;[1] Sharp was represented by counsel. At that time, the circuit court advised Sharp of the possible sentences that he would face if convicted and that it had offered a "counter-proposal" to the State's plea offer. The circuit court advised Sharp as follows:

> [C]ount [O]ne of [the] indictment charges you with attempted first[-]degree [premeditated] murder[. T]hat carries a prison term of up to life [] imprisonment. Count [T]wo of the indictment charges you with first[-]degree assault . . . . [T]hat carries up to twenty-five years [of] imprisonment. Count [T]hree is [openly] carrying a [dangerous] weapon with [the] intent to injure[. T]hat's three years [of imprisonment.]

The following exchange regarding plea offers occurred:

> [CIRCUIT COURT]: [Prosecutor], why don't you place on the record what your offer is[. T]he Court will then place on the record what it[]s offer is.
>
> [PROSECUTOR]: Your Honor, the State had agreed to offer [C]ount [T]wo, which charges [Sharp] with first[-]degree assault. Upon a finding of guilt, the State would recommend a sentence of twenty-five years [of imprisonment], suspend all but ten [years] to serve. It's my understanding that [Sharp] does not wish to take advantage of that offer.
>
> [CIRCUIT COURT]: All right[,] and the Court has offered a counter-proposal of twenty years [of imprisonment], suspending all but the first eight years[. A]nd[, Sharp's counsel], you've had a chance to discuss . . . those offers with [Sharp]?
>
> [SHARP'S COUNSEL]: Yes, I have, Your Honor.
>
> [CIRCUIT COURT]: And what is his election[]?
>
> [SHARP'S COUNSEL]: He respectfully wishes to proceed to a trial.
>
> [CIRCUIT COURT]: All right[,] and do you understand the offer, sir?
>
> [] SHARP: Yes, sir.
>
> [CIRCUIT COURT]: All right. It is your desire to plead not guilty[.]

---

[1]According to the docket entries, due to a lack of jurors, trial was continued to the next day, May 1, 2014.

On May 1, 2014, a jury trial began. On that day, before the jury panel arrived at the courtroom, the following exchange occurred, during which the circuit court re-extended the "court's offer":

[CIRCUIT COURT]: I'm just going to reiterate the Court's offer to [] Sharp. The State is offering you, sir, if you wanted to plead guilty . . . to the second count, [which] is first[-]degree assault, which has a maximum penalty of up to twenty-five years [of imprisonment], the Court is offering you a twenty[-]year sentence, suspending all but the first eight [years] as a cap. You and your attorney would be free to argue for anything that you feel is more appropriate than that. If you wanted a pre-sentence investigation or any other delayed disposition, I would afford you that. But I would guarantee you that I would not give you anything more than eight years of incarceration. Your attorney would be free to argue for anything less. Does [Sharp] understand that offer from the Court[]?

[SHARP'S COUNSEL]: Well, Your Honor, I apologize to Your Honor. I thought it was twenty [years of imprisonment], suspend all but eight [years]. I didn't realize that was the cap, so I did not explain that to [] Sharp.

[CIRCUIT COURT]: Okay. Well, why don't you go ahead and do that.

[SHARP'S COUNSEL]: Okay.

After a pause in the proceedings, the following exchange occurred:

[SHARP'S COUNSEL]: All right. Your Honor, I've had the opportunity to explain that to [] Sharp and he, with all due respect to Your Honor, he'd rather go forward by way of a trial.

[CIRCUIT COURT]: Okay. The Court withdraws its offer.

**Trial Testimony**

At trial, as a witness for the State, Kristopher Summers ("Summers") testified as follows. On March 17, 2013, Summers and his roommate, Brian Mast ("Mast"), hosted a St. Patrick's Day party, which Sharp and a Raymond Evianiak ("Evianiak") attended. Evianiak, who was "[b]elligerent and drunk[,]" insulted Sharp, who said that he wanted to

kill Evianiak. Sharp punched Evianiak in the face "a couple [of] times[.]" Evianiak did not do anything to defend himself, and passed out on the couch in the living room. Summers went to bed. The next morning, Summers awoke and saw Evianiak, who had a bloody nose. A jacket that Sharp had been wearing was "blood covered" and on the floor, and there was also broken glass on the floor.

As a witness for the State, Mast testified as follows. On the night of March 17, 2013 and the early morning of March 18, 2013, Mast, Summers, Evianiak, and Sharp were drinking at Summers's house. At 1:00 a.m., Evianiak and Sharp got into an oral altercation, and Mast went to bed. At 4:00 a.m., Mast was awakened by the sounds of screaming and bottles being broken. Mast entered the living room, saw broken glass "all over the floor[,]" and saw blood on the walls, floor, and furniture. Sharp was on top of Evianiak, who was on the floor bleeding. Mast saw Sharp hit Evianiak with a bottle.

As a witness for the State, Evianiak testified as follows. On the night of March 17, 2013 and the early morning of March 18, 2013, Evianiak, Sharp, Summers, and Mast were drinking at Summers's house. Evianiak had between four and six drinks of whiskey and became "very, very intoxicated." Evianiak also smoked two blunts' worth of marijuana and took KlonoPIN pills.[2] At some point, Evianiak was "badly" beaten. Evianiak saw Sharp while he was being beaten, and did not remember anyone else beating him. To the best of Evianiak's memory, he did not try to attack Sharp or otherwise make any aggressive

---

[2]KlonoPIN is a brand name of the prescription-only drug Clonazepam, which "slow[s] down the nervous system." Mayo Clinic, Clonazepam (Oral Route) (Dec. 1, 2015) http://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/ drg-20072102 [https://perma.cc/J4VB-ZSYM].

moves toward Sharp. Evianiak passed out and woke up on a couch "covered in blood" and with "rips" on his face and forehead. Evianiak "woke up thinking . . . '[D]id I just fight [] Sharp last night?'" Evianiak had briefly dated the mother of Sharp's child, and did not have any problems with anyone else who was at Summers's house. Evianiak called his father, who took him to MedStar Franklin Square Medical Center. Evianiak stayed at that hospital for approximately one week, after which time he was taken to the University of Maryland Medical Center. Evianiak received stitches and had his jaw wired shut for a month and a half. At the time of trial, Evianiak had scars on his face.

As a witness for the State, Jennifer Evianiak ("Jennifer"), Evianiak's sister, testified as follows. Sometime after March 17, 2013, Jennifer saw Evianiak at MedStar Franklin Square Medical Center. Jennifer did not recognize Evianiak because "all of his facial features were so covered in blood[.]" Evianiak had multiple gashes on the left side of his face, a large gash under his eye, a large gash on his forehead, and cuts and bruises on his elbow, wrist, and hand. During Jennifer's testimony, the State offered, and the circuit court admitted into evidence, twelve photographs of Evianiak's injuries.

As an expert witness for the State in the field of DNA analysis, Laura Pawloski ("Pawloski"), a forensic biologist, testified as follows. DNA from blood on the living room ceiling in Summers's house matched Evianiak's DNA. DNA from blood on the hallway ceiling, a bedroom doorway, and a bedroom doorway lock face in Summers's house matched Sharp's DNA.

The prosecutor played recordings of telephonic conversations between Sharp and his mother that occurred while Sharp was incarcerated. During one such conversation,

Sharp said that the police report stated that he "and somebody else were beating" Evianiak; Sharp's mother asked who "the other person" was; and Sharp replied: "There is no other person." During another conversation, Sharp told his mother: "St. Patrick's Day[,] I was with you all night in the house, I was downstairs playing X[b]ox, all right?"

On his own behalf, Sharp testified as follows. On the night of March 17, 2013, Sharp went to Summers's house, where he smoked marijuana, took four or five KlonoPIN pills, and drank three or four shots of alcoholic drinks. At some point, Evianiak, who was drunk, "lunge[d] toward[]" Sharp. Evianiak and Sharp "g[o]t to wrestling" and fell onto a coffee table, knocking glasses onto the floor and causing glass to get "everywhere[.]" Summers entered the room and smashed a glass bottle on Evianiak's head. The broken bottle cut Evianiak, Summers, and Sharp's hand, which squirted blood onto the walls and ceiling.

**State's Closing Argument, Verdict, and Sentencing Proceeding**

During the State's closing argument, the prosecutor said that Sharp had committed a "horrific assault" against Evianiak, who

> suffered multiple facial[] broken bones. He suffered a puncture wound to the top of his head. He suffered a giant slice to his head . . . . [T]he disfigurement . . . [is] the scars that you saw still present on [] Evianiak's face even to this day. So he's got a reminder every day when he looks in the mirror about what [Sharp] did to him on St. Patrick's Day of last year.

Before the jury reached a verdict, the State nolle prossed the charge for attempted

- 6 -

first-degree premeditated murder.[3]  The jury convicted Sharp of first-degree assault, second-degree assault, and openly wearing and carrying a dangerous weapon with the intent to injure.

On July 9, 2015, at the sentencing proceeding, the prosecutor made the following remarks in recommending a sentence:

> Your Honor, as was outlined in the pre-sentence investigation, this was far from [Sharp]'s first contact with the system. . . . Because of his moderate prior record, which includes things such as [controlled dangerous substance] distribution and burglary, Your Honor, his guidelines[4] are seven to thirteen years [of imprisonment] on the first[-]degree assault.  That is giving him the benefit of the doubt as to [] Evianiak's injuries.  [] Evianiak's injuries, both the [pre-sentence investigation] and I, indicated those injuries to be non-permanent.  Frankly, I think [that Evianiak]'s going to be living with the remnants of this for the rest of his life.  He's had numerous surgeries.  I gave [Sharp] the benefit of the doubt with the seven to thirteen [years of imprisonment under the] guidelines.  But[,] as Your Honor will remember from hearing the testimony in this case[,] and, more importantly, from seeing these pictures, the violence in this case is absolutely shocking.  This, I would argue, is not a guidelines case.  That was reflected in the State's [plea] offer prior to trial, which was twenty[-five[5] years of imprisonment], suspend all but ten[ years,] and Your Honor had offered prior to trial twenty [years of imprisonment], suspend all but a cap of eight [years].  Your Honor, based on, and, frankly, I've been doing this job for a long time now, I'm chief of violent crimes, and these pictures shocked me.  Just, he looks, [] Evianiak looked dead.  I recognize that everybody at that party was incredibly intoxicated.  I understand that.  But the evidence was also that [] Evianiak was passed out.  He was defenseless[,] and instead, we have blood spatter of both [Sharp] from his cut hand after swinging that bottle at [] Evianiak and [] Evianiak's

---

[3]According to the docket entries, the State nolle prossed the charge for attempted first-degree premeditated murder on May 5, 2014.  On that day, the jury reached a verdict.  The jury was not asked to make a finding regarding attempted first-degree premeditated murder.

[4]The prosecutor was referring to the Maryland Sentencing Guidelines Manual, which is published by the Maryland State Commission on Criminal Sentencing Policy.

[5]The prosecutor used the word "twenty."  As noted above, the State offered to recommend a sentence of twenty-five—not twenty—years of imprisonment, with all but ten years suspended.

blood on the ceiling of the location. That is, it's rare to see in a murder of violence to that level. Your Honor, given the violent nature of this crime as well as his prior record, Your Honor, the State is asking for substantial incarceration above the guidelines.

Afterward, the following exchange regarding sentencing between the circuit court and Sharp's counsel occurred:

[SHARP'S COUNSEL]: . . . I'm going to ask Your Honor to consider not incarcerating [] Sharp outside the guidelines[,] and, in fact, Your Honor offered, if [] Sharp wanted to take a plea, to sentence him to twenty years [of imprisonment], suspend all but a cap of eight [years].

[CIRCUIT COURT]: Um hm.

[SHARP'S COUNSEL]: So that Your Honor would have heard the same facts from the State in that plea. You would have heard about the injuries, you would have theoretically seen [] Evianiak, you would, I mean, nothing is anything different because we went to trial, other than [] Sharp wanted the opportunity to speak and to defend himself in what he believed was a situation that was more than just himself and mutual as well. So --

[CIRCUIT COURT]: So you don't believe that putting [the] State's witnesses, the victim through, reliving that and testifying in Court is no different than if he would have admitted what he did and pled guilty in front of me? You're saying that that, that's all the same?

[SHARP'S COUNSEL]: Your Honor, I'm not saying, I'm not saying [that] it's no different[,] but I also don't --

[CIRCUIT COURT]: That's what you, you just, you just said [that] there's no difference.

[SHARP'S COUNSEL]: No, I don't believe in punishing someone for wanting to go to trial. So, --

[CIRCUIT COURT]: Well, but the whole idea of an offer of a plea is to give something in exchange for sparing the State and the witnesses and the victims the trauma, the risk of a trial. I mean, that's --

[SHARP'S COUNSEL]: Right.

- 8 -

[CIRCUIT COURT]: Would, would you agree?

[SHARP'S COUNSEL]: I would agree --

[CIRCUIT COURT]: That there's a give and take when it comes to a plea negotiation.

[SHARP'S COUNSEL]: I would[.]

Later during the sentencing proceeding, the circuit court announced, and explained the reasons for, the sentence that it imposed as follows:

> The guidelines call for a sentence between seven years and thirteen years [of imprisonment]. I am going to exceed the guidelines in this case. I find this attack to be one of the most brutal and heinous that I have seen in almost thirty years [in the] practice of law. It is amazing that [Evianiak] was able to live after having been [so] brutally attacked. I, I've heard it described in his allocution[,] as well as some others[,] that this was a fight. This was not a fight. This was a massacre. This was a victim who was unconscious when he was attacked by [Sharp], who consistently beat [Evianiak] about his face with bottles, fracturing his eye socket, leaving him, well, it's, in this Court's eyes, it's amazing that he survived this attack. I have never seen photographs of injuries that I've seen in this case. I do not find anything in the pre-sentence report or his allocution or mitigation [that] would persuade me that [Sharp] has any redeeming qualities whatsoever. I find it repulsive that he's saying that others are victims in this matter. There's one victim, [] Evianiak. These tangential issues about [Sharp's] child, his mother,[6] where were those concerns when he was doing what he did? He wasn't concerned about them there. He is being sentenced for what he did, not for the impact that it has on his mother or the impact that it has on his child. The sentence of the Court for first[-]degree assault is twenty-five years to the Division of Corrections.[7] The sentence [for openly wearing and carrying a dangerous] weapon [with the intent to injure] is three years to the Division of Corrections, that sentence will be concurrent to the twenty-five years that has been imposed for the first[-]degree assault. He does have credit for the time [that] he has served.

---

[6]Earlier, Sharp's counsel had discussed Sharp's son and stated: "[E]very child of everybody who is incarcerated is, essentially, a victim." Afterward, Sharp's mother addressed the circuit court.

[7]For sentencing purposes, the circuit court merged the conviction for second-degree assault with the conviction for first-degree assault.

**Procedural History in the Appellate Courts**

On July 16, 2014, Sharp noted an appeal. In the Court of Special Appeals, Sharp contended that the circuit court erred in impermissibly considering during sentencing his decision not to plead guilty. In an unreported opinion dated June 29, 2015, the Court of Special Appeals affirmed the judgments of conviction. That Court reasoned that Sharp failed to preserve for appellate review the issue of whether the circuit court impermissibly considered during sentencing his decision not to plead guilty, as, according to the Court of Special Appeals, Sharp's counsel did not object during the exchange with the circuit court, and Sharp's counsel appeared to agree with the circuit court at the end of the exchange, and thus acquiesced to the circuit court's ruling. Alternatively, as to the merits, the Court of Special Appeals concluded that the circuit court did not err at the sentencing proceeding, as the exchange between Sharp's counsel and the circuit court did not indicate that that the circuit court was influenced in any way during sentencing by the fact that Sharp had declined to plead guilty.

On August 10, 2015, Sharp petitioned for a writ of *certiorari*. On October 16, 2015, this Court granted the petition. See Sharp v. State, 445 Md. 19, 123 A.3d 1005 (2015).[8]

**DISCUSSION**

**I.**

Sharp contends that he preserved for appellate review the issue of whether the circuit court impermissibly considered during sentencing his decision not to plead guilty because,

---

[8]Although Sharp addresses the merits before the issue as to preservation both in the petition for a writ of *certiorari* and in his brief, we address the issue as to preservation first.

during the sentencing proceeding, his counsel stated: "I don't believe in punishing someone for wanting to go to trial." Sharp acknowledges that his counsel later said "I would agree" in response to the circuit court's statement that "the whole idea of an offer of a plea is to give something in exchange for sparing the State and the witnesses and the victims the trauma, the risk of a trial[,]" but Sharp argues that his counsel did not agree that it was acceptable to punish him for deciding to go to trial, or in any way forfeit his objection to the circuit court's earlier statements.

The State responds that Sharp failed to preserve the issue for appellate review because Sharp's counsel's statement—"I don't believe in punishing someone for wanting to go to trial"—was an "observation about sentencing considerations" instead of an objection to the circuit court's alleged impermissible consideration of Sharp's election to decline the circuit court's plea offer. Alternatively, the State contends that, even if Sharp's counsel's statement constituted an objection, Sharp forfeited appellate review of the issue because, afterward, Sharp's counsel agreed with the circuit court's assertion that declining to impose a reduced sentence that was part of a plea offer is not the same as punishing a defendant for declining a plea offer.

"Ordinarily, the appellate court will not decide any [non-jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]" Md. R. 8-131(a). In a criminal case, "[f]or purposes of review by the trial court or on appeal of any [] ruling or order [other than the admission of evidence], it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the [trial] court . . . the objection to the action of the [trial] court." Md. R. 4-323(c).

- 11 -

Under Maryland Rule 8-131(a), a defendant must object to preserve for appellate review an issue as to a trial court's impermissible considerations during a sentencing proceeding. See Abdul-Maleek v. State, 426 Md. 59, 69, 43 A.3d 383, 389 (2012) ("[T]here is no good reason why either the circumstances presented here should be exempt from the preservation requirement or the trial court should not have been given the opportunity to address at the time the concern that [the defendant] now raises.").[9] Accordingly, in Abdul-Maleek, 426 Md. at 69, 68, 43 A.3d at 389, 388, this Court held that, by failing to object, a defendant failed to preserve for appellate review an issue as to a trial court's impermissible considerations during a sentencing proceeding.[10]

Here, we agree with Sharp that the issue of whether the circuit court impermissibly considered during sentencing his decision not to plead guilty is preserved for appellate review. Sharp's counsel asked the circuit court to impose the sentence that was part of the circuit court's plea offer. Sharp's counsel stated: "[N]othing is anything different because we went to trial[.]" Soon afterward, the circuit court stated: "So you don't believe that putting [the] State's witnesses, the victim through, reliving that and testifying in Court is no different than if he would have admitted what he did and pled guilty in front of me?"

---

[9]Where a defendant contends that a sentence is inherently illegal—as opposed to contending that a trial court might have been motivated by an impermissible consideration during sentencing—the defendant need not object to preserve the issue for appellate review. See Abdul-Maleek, 426 Md. at 69, 43 A.3d at 388 ("[I]n the limited context of review of sentences alleged to be inherently illegal[,] the failure to object will not preclude appellate review[.]" (Citations omitted)). Here, Sharp does not contend that the sentence was inherently illegal.

[10]In Abdul-Maleek, 426 Md. at 70, 43 A.3d at 389, this Court exercised its discretion to address the unpreserved issue as to the trial court's impermissible considerations during the sentencing proceeding.

Soon after that, Sharp's counsel stated: "I don't believe in punishing someone for wanting to go to trial." Sharp's counsel's statement was sufficient to "make[] known to the [circuit] court[,]" Md. R. 4-323(c), that Sharp took issue with what his counsel characterized as the circuit court's "punishing [Sharp] for wanting to go to trial." In other words, Sharp's counsel's statement made known his objection to the circuit court's allegedly penalizing Sharp by impermissibly considering during sentencing that Sharp declined the State's and the circuit court's plea offers.

We are not persuaded by the State's contention that Sharp forfeited appellate review of the issue by saying "I would agree" in response to the circuit court's statement that "the whole idea of an offer of a plea is to give something in exchange for sparing the State and the witnesses and the victims the trauma, the risk of a trial." In agreeing with the circuit court's statement, Sharp's counsel did not retreat from the position that he had taken earlier—namely, the position that the circuit court should not penalize Sharp for having elected to go to trial. Sharp's counsel's agreement with the circuit court was nothing more than an acknowledgement of the well-known principle that one of the reasons that the State may offer—and, upon the defendant's agreement, the trial court may accept—a plea agreement is to save the victim and other witnesses the experience of testifying and being cross-examined at trial.

Having concluded that Sharp preserved for appellate review the issue of whether the circuit court impermissibly considered during sentencing his decision not to plead guilty, we proceed to address the merits.

## II.

Sharp contends that the circuit court erred in impermissibly considering during sentencing his decision not to plead guilty. In support of his assertion that the circuit court impermissibly considered during sentencing his decision not to plead guilty, Sharp relies on the circumstance that the circuit court stated to Sharp's counsel, among other things: "you don't believe that putting [the] State's witnesses, the victim through, reliving that and testifying in Court is no different than if he would have admitted what he did and pled guilty in front of me?"; and "the whole idea of an offer of a plea is to give something in exchange for sparing the State and the witnesses and the victims the trauma, the risk of a trial." At oral argument, Sharp's counsel suggested that the circuit court sentenced Sharp more harshly because Sharp declined the circuit court's plea offer. Specifically, Sharp's counsel argued that "the last [plea offer] to be rejected was the one offered by the [circuit court], wh[ich] is now sentencing [] Sharp, and is now making these comments at sentencing." Sharp's appellate counsel observed that, at sentencing, Sharp's trial counsel wanted to remind the circuit court that it had offered a "cap" of eight years of imprisonment.

In its brief, the State responds that the record does not support the inference that the circuit court impermissibly considered during sentencing Sharp's decision not to plead guilty. The State points out that the circuit court's remarks on which Sharp relies were made in response to Sharp's counsel's request that the circuit court impose the sentence that was part of the circuit court's plea offer. The State argues that, in making the statements on which Sharp relies, the circuit court did not indicate that it would "punish"

- 14 -

Sharp for not pleading guilty; instead, the circuit court simply explained "that there [i]s a difference between punishing someone for demanding a trial and not imposing the same lenient sentence" that was part of a plea offer.

A trial court "may exercise wide discretion in fashioning a defendant's sentence." McGlone v. State, 406 Md. 545, 557, 959 A.2d 1191, 1197 (2008) (citation omitted). Thus, generally, this Court reviews for abuse of discretion a trial court's decision as to a defendant's sentence. See State v. Wilkins, 393 Md. 269, 279-80, 900 A.2d 765, 771-72 (2006) (This Court listed cases in which this Court reviewed for abuse of discretion trial courts' decisions as to defendants' sentences.). There are "only three grounds for appellate review of [a] sentence[] . . . : (1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) whether the [trial court] was motivated by ill-will, prejudice[,] or other impermissible considerations; and (3) whether the sentence is within statutory limits." Jones v. State, 414 Md. 686, 693, 997 A.2d 131, 135 (2010) (citation and internal quotation marks omitted).

This case involves the second ground for appellate review of a sentence—namely, alleged impermissible considerations by a trial court during sentencing. Under the Self-Incrimination Clauses of the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights,[11] the Trial Clauses of the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration

---

[11]"No person shall . . . be compelled in any criminal case to be a witness against him[- or her]self[.]" U.S. Const. amend. V. "[N]o [person] ought to be compelled to give evidence against him[- or her]self in a criminal case." Md. Decl. of Rts. Art. 22.

of Rights,[12] and the Due Process Clause of the Fourteenth Amendment to the United States Constitution,[13] a trial court may not consider during sentencing a defendant's decision not to plead guilty. See Johnson v. State, 274 Md. 536, 537, 542-43, 543 n.5, 336 A.2d 113, 114, 117, 117 n.5 (1975) ("The scope of this Court's review, as directed in the writ [of *certiorari*], is 'limited solely to the question (of) whether the (trial) court denied . . . [the defendant] due process by sentencing him 'to a longer term based upon his not admitting guilt but instead pleading not guilty and testifying in his own behalf.' . . . [I]t is improper to conclude that a decision, constitutionally protected, not to plead guilty . . . is a factor which ought to, in any way, influence the [trial court in] sentencing [] to the detriment of the [defendant]. . . . The constitutional protections which may be infringed upon if a penalty were attached to th[e] decision [as to sentencing] include: Amendments V [(right against self-incrimination)] and VI [(right to a trial)] to the United States Constitution and Articles 21 [(right to a trial)] and 22 [(right against self-incrimination)] of the Maryland Declaration

---

[12]"In all criminal prosecutions, the accused shall enjoy the right to a . . . trial[.]" U.S. Const. amend. VI. "[I]n all criminal prosecutions, every [person] hath a right to . . . a . . . trial[.]" Md. Decl. of Rts. Art. 21. We use the phrase "Trial Clauses" because a defendant's decision not to plead guilty does not implicate the defendant's right for a trial to be speedy, public, and by a jury; instead, a defendant's decision not to plead guilty implicates the defendant's right to a trial in the first place. In other words, the right at issue is the right to choose not to plead guilty, and thus to proceed with a trial, whether by a jury or by a trial court.

[13]"No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. Under the Due Process Clause, the Self-Incrimination Clause and the Trial Clause apply to the States. See Coleman v. State, 434 Md. 320, 333, 75 A.3d 916, 923 (2013) ("The Fifth Amendment, as applied to the states by the Fourteenth Amendment, guarantees an accused the right to invoke his privilege against self-incrimination." (Citation omitted)); Boulden v. State, 414 Md. 284, 294, 995 A.2d 268, 273 (2010) ("The Sixth Amendment's guarantee of a jury trial is applicable to the States through the Fourteenth Amendment." (Citation omitted)).

of Rights." (Parentheses in original) (citation and some internal quotation marks omitted)).

Accordingly, in <u>Johnson</u>, <u>id.</u> at 545, 539-40, 336 A.2d at 118, 115, this Court vacated a sentence and remanded for resentencing where, during sentencing, a trial court stated:

> [I]f you had come in here with a plea of guilty and been honest about (it) and said, ["]Of course I did it,["] which you did, you would probably have gotten a modest sentence, concurrent with the one [that you are serving] in the District of Columbia, and you would have gotten out of it. But with this attitude that you have[,] you can't receive that kind of treatment. The sentence of the court is that you be confined under the jurisdiction of the Department of Correctional Services for a period of twelve years, to run concurrent with the sentence that you are serving in the District of Columbia.

(Parentheses in original) (paragraph break omitted). This Court explained that, in making this statement, the trial court

> indicated that [it], at least to some degree, punished [the defendant] more severely because he failed to plead guilty and, instead, stood trial. Although a reading of the [trial court]'s remarks in full does not necessarily demonstrate that a more severe sentence was imposed, the words just quoted manifest that an impermissible consideration may well have been employed. Any doubt in this regard must be resolved in favor of the defendant.

<u>Id.</u> at 543, 336 A.2d at 117.

Similarly, in <u>Abdul-Maleek</u>, 426 Md. at 74, 66-67, 43 A.3d at 391, 387, this Court vacated a sentence and remanded for resentencing where, during sentencing, a trial court stated:

> You have every right to go to trial in this case, which you did—not once, but twice. [The victim] was victimized, and then she had to . . . testify in [the] District Court; then she had to come back [] and testify [at a de novo trial] in [a c]ircuit [c]ourt, and she had to do that because you have every right to have all of those opportunities to put forth your position. I am at a total loss. The Court will impose a sentence of [eighteen] months to the Montgomery County Detention Center. The Court will suspend all but eight months, and

- 17 -

the Court will recommend the Pre-Release Center[ and] place you on [eighteen] months of supervised probation upon your release.

(Emphasis and paragraph break omitted). Writing for this Court, then-Judge Barbera explained:

Reading these statements in the context of the entire sentencing proceeding (which necessarily includes consideration of the [prosecutor]'s explicit request that the [trial] court impose a higher sentence than the District Court had imposed), we do not conclude that the [trial] court *actually considered* the fact of [the defendant]'s exercise of his right to a de novo [trial] and imposed a more severe sentence as punishment for having done so. To the contrary, we infer that the [trial court]'s comments were intended simply to explain to the victim the reason for her return to court for a [de novo] trial, while, at the same time, to underscore [the defendant]'s entitlement to avail himself of a right granted him by our system of justice. Likewise, we are quite conscious of the doctrine that [trial court]s are presumed to know the law and apply it correctly, and we are confident the [trial] court did precisely that here. All that said, we are constrained nonetheless to remand this case for resentencing because the [trial] court's explicit reference to [the defendant]'s exercise of his de novo [trial] right could lead a reasonable person to infer that the court *might* have been motivated by an impermissible consideration. In this circumstance, we are bound to resolve any doubt in [the defendant]'s favor.

Id. at 73-74, 43 A.3d at 391 (emphasis in original) (brackets, citations, internal quotation marks, and paragraph break omitted).

Under Abdul-Maleek, id. at 73, 74, 43 A.3d at 391, where a defendant alleges that a trial court was motivated by an impermissible consideration during sentencing, an appellate court must read the trial court's statements "in the context of the entire sentencing proceeding" to determine whether the trial court's statements "could lead a reasonable person to infer that the [trial] court might have been motivated by an impermissible consideration." (Brackets, citation, emphasis, and internal quotation marks omitted). Accordingly, we examine the context of the entire sentencing proceeding, which includes

Sharp's counsel's discussion of the circuit court's plea offer.

We begin by observing that the discussions of plea offers arose before sentencing—specifically, on the day before trial, and again on the first day of trial. On the day before trial, the circuit court accurately advised Sharp that, if convicted, he faced the following possible sentences: life imprisonment for attempted first-degree premeditated murder, twenty-five years of imprisonment for first-degree assault, and three years of imprisonment for openly wearing and carrying a dangerous weapon with intent to injure.[14] The prosecutor stated that the State had offered, and Sharp had declined, a plea agreement under which Sharp would plead guilty to first-degree assault, and the State would recommend a sentence of twenty-five years of imprisonment, with all but ten years suspended. The circuit court stated that it had offered a plea agreement under which Sharp would plead guilty to first-degree assault, and the circuit court would sentence Sharp to twenty years of imprisonment, with all but eight years suspended. The circuit court's plea offer differed from the State's plea offer in one respect, by two non-suspended years of imprisonment—*i.e.*, eight non-suspended years of imprisonment versus ten non-suspended years. Through his counsel, Sharp declined the circuit court's plea offer. At this point, the circuit court expressed no opinion or disapproval about Sharp having declined the circuit court's plea offer.

On the day on which trial would begin, before the jury panel came to the courtroom,

---

[14]See Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol.) §§ 2-205 (maximum sentence for attempted first-degree premeditated murder), 3-202(b) (maximum sentence for first-degree assault), 4-101(d) (maximum sentence for openly wearing or carrying a dangerous weapon with intent to injure).

the circuit court stated that, under its plea offer, eight non-suspended years of imprisonment would be "a cap[,]" and Sharp could argue for a lesser sentence. After conferring with his counsel, Sharp again, through counsel, declined the circuit court's plea offer. Again, the circuit court expressed no opinion or disapproval about Sharp's having declined the circuit court's plea offer.

At the sentencing proceeding, the prosecutor advised the circuit court that the Maryland Sentencing Guidelines Manual provided for a sentence between seven and thirteen years of imprisonment. The prosecutor argued that this was "not a guidelines case[;t]hat was reflected in the" State's and the circuit court's plea offers. The State recommended a sentence of "substantial incarceration above the guidelines" based on the "absolutely shocking" level of violence; "Evianiak's injuries" and "numerous surgeries"; and the fact that Evianiak had been "passed out" and "defenseless[.]" By contrast, Sharp's counsel asked the circuit court "to consider not incarcerating [] Sharp outside the guidelines" and asked the circuit court to impose the sentence that was part of the circuit court's plea offer.

Upon review of the circuit court's statements at sentencing "in the context of the entire sentencing proceeding[,]" applying the "reasonable person" standard that we employed in Abdul-Maleek, 426 Md. at 73-74, 43 A.3d at 391 (citation omitted), we have no difficulty concluding that the circuit court's statements do not give rise to the inference that the circuit court might have been motivated by the impermissible consideration of Sharp's decision not to plead guilty. While arguing in favor of a sentence that was within the guidelines' range, Sharp's counsel asked the circuit court to impose the sentence that

- 20 -

was part of the circuit court's plea offer. Sharp's counsel asserted that "nothing [wa]s anything different" by virtue of Sharp's decision not to plead guilty. The circuit court interjected to correctly state that a trial was, in fact, "different" from a guilty plea, in that a trial "put[ the] State's witnesses[ and] the victim through[] reliving [their experiences] and testifying in Court[.]" Indeed, Sharp's counsel acknowledged that the circuit court was correct: "I'm not saying [that] it's no different[.]" The circuit court pointed out that Sharp's counsel had just contradicted herself: "[Y]ou just said [that] there's no difference." Sharp's counsel responded: "No, I don't believe in punishing someone for wanting to go to trial." The circuit court swiftly rebutted any implication that it was "punishing" Sharp for his decision not to plead guilty: "[T]he whole idea of an offer of a plea is to give something in exchange for sparing the State and the witnesses and the victims the trauma, the risk of a trial. . . . [T]here's a give and take when it comes to a plea negotiation." Once again, Sharp's counsel acknowledged that the circuit court was correct.

Sharp's counsel asked the circuit court to impose the sentence that was part of the circuit court's plea offer—*i.e.*, a sentence that was more lenient than the sentence that the prosecutor sought at sentencing. In Sweetwine v. State, 42 Md. App. 1, 10 n.4, 398 A.2d 1262, 1268 n.4 (1979), aff'd, 288 Md. 199, 421 A.2d 60, cert. denied, 449 U.S. 1017 (1980), Judge Moylan aptly observed that a defendant who proceeds to trial is not entitled to the same lenient sentence that was part of a plea offer:

> The norm is what an appropriate sentence would be following a full-blown trial and conviction. The departure from the norm is the abnormally lenient sentence [that] is exchanged, in a flat-out [q]uid pro quo deal, for the abnormal foregoing of all chance of acquittal and the abnormal foregoing of "[a] day in court" to which a defendant would be otherwise entitled. . . . It is

one thing to punish; it is quite another to deny a reward [that] has no longer been earned.

In this case, the circuit court essentially agreed with the discussion that Judge Moylan set forth in Sweetwine in rebutting Sharp's counsel's allegation that the circuit court would be "punishing" Sharp by not imposing the sentence that was part of the circuit court's plea offer.

Significantly, the circuit court did not make the statements at issue while announcing and giving the reasons for the circuit court's sentence; to the contrary, the circuit court made the statements during an earlier exchange that began when Sharp's counsel asked the circuit court to impose the sentence that was part of the circuit court's plea offer and asserted that "nothing [wa]s anything different" by virtue of Sharp's decision not to plead guilty. In expressing its views about why sentencing after trial differed from sentencing after a guilty plea, the circuit court merely responded to Sharp's counsel's assertion; contrary to Sharp's contention in this Court, the circuit court was not spontaneously explaining one of the circuit court's considerations during sentencing.

Indeed, later, when the circuit court announced, and explained the reasons for, its sentence, the circuit court never so much as mentioned the circuit court's and the State's plea offers, much less that Sharp had declined them. Instead, the circuit court identified the following entirely permissible reasons for its sentence: while Evianiak was unconscious, Sharp "consistently beat [Evianiak] about his face with bottles"; the incident was "a massacre[,]" "not a fight"; Sharp's "attack" on Evianiak was "the most brutal and heinous that [the circuit court] ha[d] seen in almost thirty years [in the] practice of law[,]"

and the circuit court "ha[d] never seen photographs of injuries" like Evianiak's, including a fractured eye socket; it was "amazing that [Evianiak] was able to live after having been [so] brutally attacked"; nothing in the pre-sentence report or Sharp's allocution or mitigation "persuade[d the circuit court] that [Sharp] ha[d] any redeeming qualities whatsoever"; and the circuit court "f[ou]nd it repulsive that" Sharp asserted that his mother and child were "victims[.]"

These circumstances materially distinguish this case from both Johnson, 274 Md. at 539-40, 336 A.2d at 115, and Abdul-Maleek, 426 Md. at 66-67, 43 A.3d at 387, in each of which a trial court commented on a defendant's assertion of his right to a trial while explaining the reasons for the trial court's sentence—indeed, in each of the two cases, the trial court announced its sentence **immediately** after discussing the defendant's assertion of his right to a trial. By contrast, here, the circuit court made the statements at issue before imposing the sentence, and in response to Sharp's counsel's assertion that "nothing [wa]s anything different" by virtue of Sharp's decision not to plead guilty.

At oral argument, Sharp's appellate counsel noted that the prosecutor was the first to bring up plea offers at the sentencing proceeding. Nonetheless, it cannot be inferred that Sharp's trial counsel was responding to the prosecutor when Sharp's trial counsel asserted that "nothing [wa]s anything different" by virtue of Sharp's decision not to plead guilty. For one thing, the prosecutor never mentioned that Sharp had declined the State's and the circuit court's plea offers, much less invited the circuit court to impermissibly consider that circumstance. Instead, the prosecutor mentioned the plea offers to point out that the sentences under both of the plea offers—ten non-suspended years of imprisonment under

the State's plea offer, and eight non-suspended years of imprisonment under the circuit court's plea offer—were within the guidelines' range of seven to thirteen years of imprisonment. Specifically, while arguing in favor of a sentence above the guidelines' range, the prosecutor stated: "This, I would argue, is not a guidelines case. That was reflected in the State's [plea] offer prior to trial, which was twenty[-five years of imprisonment], suspend all but ten[ years,] and Your Honor had offered prior to trial twenty [years of imprisonment], suspend all but a cap of eight [years]." The prosecutor's logic was that, if the sentences under the plea offers—which, of course, were intended to provide for a sentence that was more lenient than a sentence after a trial—were within the guidelines' range, then the non-lenient sentence after a trial should be above the guidelines' range. See Sweetwine, 42 Md. App. at 10 n.4, 398 A.2d at 1268 n.4 ("The norm is what an appropriate sentence would be following a full-blown trial and conviction. The departure from the norm is the abnormally lenient sentence" under a plea agreement.).

In addition to the prosecutor's never having brought up that Sharp had declined the State's and the circuit court's plea offers, there is the circumstance that Sharp's counsel made the statement well after the prosecutor had finished addressing the circuit court. Immediately after the prosecutor finished addressing the circuit court, the circuit court told Sharp's trial counsel: "[B]e glad to hear from you." Sharp's trial counsel began addressing the circuit court, and spoke at length before raising the issue of the circuit court's plea offer. The record reflects that, four pages in the transcript after Sharp's counsel began addressing the circuit court, Sharp's counsel stated: "I'm going to ask Your Honor to consider not incarcerating [] Sharp outside the guidelines[,] and, in fact, Your Honor offered, if [] Sharp

- 24 -

wanted to take a plea, to sentence him to twenty years [of imprisonment], suspend all but a cap of eight [years]." In the interim, once Sharp's counsel began speaking, the prosecutor remained silent. On this record, it cannot be inferred that, in making the remarks in question, Sharp's trial counsel was directly responding to the prosecutor. To the contrary, the timing and the substance of Sharp's trial counsel's statements establish that, on her own initiative, Sharp's trial counsel brought up the circuit court's plea offer while arguing for a sentence that was within the guidelines' range—*i.e.*, the sentence that was part of the circuit court's plea offer.

Given that one of the circumstances that comprised Sharp's counsel's argument that the circuit court might have been motivated by an impermissible consideration during sentencing was that the circuit court made a "court's offer," which Sharp rejected, we will address the propriety of the circuit court having made a "court's offer."

In Barnes v. State, 70 Md. App. 694, 711, 706, 523 A.2d 635, 643, 641 (1987), the Court of Special Appeals had an opportunity to discuss this topic, and held that a defendant's Alford plea[15] was involuntary where, "[r]ather than merely approving or rejecting a plea agreement between the State[] and the defendant, the [trial court], in effect, negotiated [its] own agreement with the defendant by offering him a more favorable sentence than the State had been willing to offer in its plea discussions." In Barnes, 70 Md. App. at 696-97, 523 A.2d at 636, the State charged the defendant with one count of

---

[15]"Drawing its name from *North Carolina v. Alford*, 400 U.S. 25[] (1970), [an *Alford*] plea is a guilty plea containing a protestation of innocence." Silver v. State, 420 Md. 415, 424 n.4, 23 A.3d 867, 872 n.4 (2011) (citation and internal quotation marks omitted).

murder, one count of attempted murder, one count of attempted robbery with a dangerous weapon, and two counts of use of a firearm in the commission of a felony or crime of violence. On the day on which trial was to begin, the trial court advised the defendant that, if convicted of all of the charges, the defendant faced two sentences of imprisonment for life, plus fifty years of imprisonment. See id. at 697, 523 A.2d at 636. The prosecutor stated that the State was offering a plea agreement under which the defendant would plead guilty to second-degree murder and one count of use of a firearm in the commission of a felony or crime of violence, and the State would recommend a sentence of fifty years of imprisonment. See id. at 697-98, 523 A.2d at 636. The trial court advised the defendant in relevant part:

> [I]f you wanted to plead guilty, I was willing, even though the State is screaming and kicking for [fifty] years, . . . I would give you a total of [thirty] years. . . . I am going to give you two minutes to talk to [your counsel] . . . . [I]n two minutes[,] that [thirty-]year offer I am going to withdraw forever.

Id. at 698, 523 A.2d at 636-37. After a brief recess, the trial court again advised the defendant that it was offering a sentence that was "'below what the State was recommending.'" Id. at 698, 523 A.2d at 637. The defendant entered, and the trial court accepted, an Alford plea as to second-degree murder and one count of use of a handgun in the commission of a felony or crime of violence. Barnes, 70 Md. App. at 701, 523 A.2d at 638.

On appeal, the defendant contended that the trial court's participation in the plea negotiation process rendered his Alford plea involuntary. Id. at 701, 523 A.2d at 638. In so contending, the defendant "suggest[ed] that *any* judicial participation in plea discussions

is coercive and renders a resultant guilty plea involuntary *per se*." Id. at 701, 523 A.2d at 638 (emphasis in original).

The Court of Special Appeals began its analysis by pointing out that, "[a]lthough [Maryland Rule 4-243 (Plea Agreements)] does not expressly prohibit judicial participation in plea bargaining, its language contemplates a limited role for the trial [court] in that process." Id. at 702, 523 A.2d at 639. Although this Court has amended Maryland Rule 4-243 since Barnes, Maryland Rule 4-243's relevant language remains the same. Both now and at the time of Barnes, Maryland Rule 4-243(a) contained the following language:

> The defendant may enter into an agreement with **the State's Attorney** for a plea of guilty or nolo contendere on any proper condition, including one or more of the following: . . . [t]hat **the parties** will submit a plea agreement proposing a particular sentence, disposition, or other judicial action **to a judge** for consideration pursuant to section (c) of this Rule.[16]

(Emphasis added). In turn, both now and at the time of Barnes, Maryland Rule 4-243(c)(1) contained the following language:

> If a plea agreement has been reached . . . for a plea of guilty or nolo contendere which contemplates a particular sentence, disposition, or other judicial action, the defense counsel and the State's Attorney shall advise the judge of the terms of the agreement when the defendant pleads. **The judge may then accept or reject the plea** and, if accepted, may approve the agreement or defer decision as to its approval or rejection until after such pre-sentence proceedings and investigation as the judge directs.

(Emphasis added).

In Barnes, 70 Md. App. at 704, 523 A.2d at 640, after quoting the above language from Maryland Rule 4-243, the Court of Special Appeals observed that Maryland Rule 4-

---

[16]At the time of Barnes, this language was in Maryland Rule 4-243(a)(6). Now, this language is in Maryland Rule 4-243(a)(1)(F).

243 does not "prohibit [a] trial [court that] finds a proposed agreement unsatisfactory . . . from indicating what type of agreement would be acceptable." The Court of Special Appeals stated: "The role of the [trial court that is] contemplated by [Maryland] Rule 4-243 is consistent with the judicial role in plea negotiations suggested by Standard 14-3.3 [(Responsibilities of the judge)] of the American Bar Association's Standards for Criminal Justice, Pleas of Guilty (2d[.] ed. 1980 & 1986 Supp.)." Barnes, 70 Md. App. at 704, 523 A.2d at 640 (footnote omitted). Although the American Bar Association has republished its Standards for Criminal Justice as to Pleas of Guilty ("ABA Standards") since Barnes, much of ABA Standard 14-3.3's relevant language has remained the same.[17]

That said, the American Bar Association has substantively amended certain parts of ABA Standard 14-3.3 since Barnes. For example, at the time of Barnes, ABA Standard 14-3.3(f) stated in pertinent part: "**Except as otherwise provided** in [ABA Standard 14-3.3], the judge should never through word or demeanor, either directly or indirectly, communicate to the defendant or defense counsel that a plea agreement should be accepted or that a guilty plea should be entered." (Emphasis added). This provision's modern counterpart, current ABA Standard 14-3.3(c), does not contain a caveat, and states in its entirety: "The judge should not through word or demeanor, either directly or indirectly, communicate to the defendant or defense counsel that a plea agreement should be accepted

_____

[17]The version of ABA Standard 14-3.3 from the Second Edition of the ABA Standards can be found in Barnes, 70 Md. App. at 705 n.3, 523 A.2d at 640 n.3. Current ABA Standard 14-3.3—from the Third Edition of the ABA Standards, which the American Bar Association published in 1999 —can be found at the American Bar Association, Pleas of Guilty 127-28 http://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/pleas_guilty.authcheckdam.pdf [https://perma.cc/4DN5-G738].

or that a guilty plea should be entered." ABA Standards (3d. ed.) at 128.

At the time of <u>Barnes</u>, ABA Standard 14-3.3(f) included a caveat because, at the

time of <u>Barnes</u>, ABA Standard 14-3.3(c) stated in pertinent part:

> When the parties are unable to reach a plea agreement, if the defendant's counsel and prosecutor agree, they may request to meet with the judge in order to discuss a plea agreement. If the judge agrees to meet with the parties, the judge shall serve as a moderator in listening to their respective presentations concerning appropriate charge or sentence concessions. Following the presentation of the parties, the judge may indicate what charge or sentence concessions would be acceptable[.]

By contrast, current ABA Standard 14-3.3(d) states in pertinent part: "A judge should not

ordinarily participate in plea negotiation discussions among the parties. Upon the request

of the parties, a judge may be presented with a proposed plea agreement negotiated by the

parties and may indicate whether the court would accept the terms as proposed and[,] if

relevant, indicate what sentence would be imposed." ABA Standards (3d. ed.) at 128. The

Commentary to current ABA Standard 14-3.3(c) and (d) explains the relevant substantive

amendments to ABA Standard 14-3.3 as follows:

> [Current ABA Standard 14-3.3(c)] is important because it protects the constitutional presumption of innocence, and avoids placing judicial pressure on the defendant to compromise his or her rights. . . . The approach taken by [current ABA Standard 14-3.3(c) and (d)] differs from that in the [S]econd [E]dition [of the ABA Standards], which had allowed for a more active role for judges in plea negotiations. It . . . is more consistent with federal law and the rules in many [S]tates. A number of court decisions have condemned judicial participation in plea negotiations. Similarly, the Federal Rules of Criminal Procedure[18] and numerous statutes and rules forbid the involvement of judges in plea discussions. While there is some evidence that judicial participation in plea negotiations is common in some [S]tate courts, this is not a salutary development. [Current ABA Standard 14-3.3(c) and

---

[18]"The court must not participate in [] discussions [of plea agreements]." Fed. R. Crim. Proc. 11(c)(1).

(d)] reflect the view that direct judicial involvement in plea discussions with the parties tends to be coercive and should not be allowed. Providing an active role for judges in the plea negotiation process, even at the parties' request, is ill-advised, particularly where that judge will preside at trial or at evidentiary hearings should the plea negotiations fail . . . . Exposure to the facts and tactical considerations revealed during guilty plea negotiations may unduly color the judge's view of the evidence, and predispose the judge in his or her legal rulings.

ABA Standards (3d. ed.) at 134-35 (paragraph break and footnotes omitted).

In Barnes, 70 Md. App. at 707, 523 A.2d at 641, in a determination that was consistent with current ABA Standard 14-3.3, the Court of Special Appeals concluded that, by making a plea offer and encouraging the defendant to accept it, the trial court "improperly interjected [it]self into the plea bargaining process as an active negotiator, infringing upon the function reserved to counsel in the adversary process." Ultimately, the Court of Special Appeals held that the defendant's Alford plea was involuntary because "the language employed by the trial [court] . . . very probably intimidated the [defendant] into" entering an Alford plea. Barnes, 70 Md. App. at 711, 523 A.2d at 643. Neither this Court nor the Court of Special Appeals has overruled or in any way abrogated the holding of the Court of Special Appeals in Barnes.

This case illustrates one of the myriad of issues that may occur where a trial court makes a "court's offer" of a plea agreement—namely, an allegation that, during sentencing, a trial court might have been motivated by the impermissible consideration of a defendant's having declined the trial court's plea offer. To avoid a minefield of issues, we advise trial courts to comport with both Barnes and current ABA Standard 14-3.3 and refrain from directly making plea offers to defendants in criminal cases. Indeed, Maryland Rule 4-243

does not authorize a trial court to make a plea offer. It is the role of the State, not a trial court, to make a plea offer. See Md. R. 4-243(a)(1) ("The defendant may enter into an agreement with **the State's Attorney** for a plea of guilty or nolo contendere on any proper condition[.]" (Emphasis added)). The trial court's role is to approve or reject a plea agreement that the parties submit to it, not to come up with its own plea offer—*i.e.*, a "court's offer." See Md. R. 4-243(a)(1)(F) ("**[T]he parties** will submit a plea agreement proposing a particular sentence, disposition, or other judicial action **to a judge** for consideration pursuant to section (c) of this Rule." (Emphasis added)); Md. R. 4-243(c)(1) ("**The judge may then accept or reject the plea**[.]" (Emphasis added)).

Indeed, there are many reasons why a trial court should not make a plea offer. See Current ABA Standard 14-3.3(c) ("The judge should not through word or demeanor, either directly or indirectly, communicate to the defendant or defense counsel that a plea agreement should be accepted or that a guilty plea should be entered."); Commentary to Current ABA Standard 14-3.3(c) and (d), ABA Standards (3d. ed.) at 134-35 ("[Current ABA Standard 14-3.3(c)] is important because it protects the constitutional presumption of innocence, and avoids placing judicial pressure on the defendant to compromise his or her rights. . . . [Current ABA Standard 14-3.3(c) and (d)] reflect the view that direct judicial involvement in plea discussions with the parties tends to be coercive and should not be allowed."). And, even a trial court with the best of intentions may be perceived as pressuring or coercing a defendant to accept the court's plea offer. See, e.g., Barnes, 70 Md. App. at 711, 523 A.2d at 643 ("[T]he language employed by the trial [court] . . . very probably intimidated the [the defendant] into" entering an Alford plea.).

Here, Sharp contends that the circuit court impermissibly considered during sentencing his decision not to accept the circuit court's plea offer and plead guilty. Lest there be any doubt, the record contains no indication that the circuit court imposed a harsher sentence because Sharp declined either the circuit court's plea offer or the State's plea offer. At the sentencing proceeding, Sharp's counsel, not the circuit court, initiated the exchange about plea offers. And, although Sharp's counsel referred to the circuit court's plea offer—as opposed to the State's—the circuit court observed that Sharp had declined to "ple[a]d guilty in front of" the circuit court. The circuit court's observation included Sharp's decision to decline both the circuit court's plea offer **and** the State's plea offer. Had the circuit court followed the procedure that the Court of Special Appeals outlined in <u>Barnes</u>, 70 Md. App. at 704, 523 A.2d at 640, the circuit court would have immunized itself from the allegation of impermissible considerations during sentencing based on the circuit court's having made a "court's offer." That said, in sum, the circuit court's remarks before the imposition of the sentence do not give rise to the inference that the circuit court might have been motivated in any way by the impermissible consideration of Sharp's decision not to plead guilty.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

Judge Battaglia joins in the judgment only.